The case for argument is 15-5057 Liberty Ammunition v. United States first term is intermediate opposite ends. As I said, it's in Claim 32, the second independent claim of the patent. It's our contention that based on the clear claim language and numerous specification disclosures, the government correctly construed this language to require that the interface not reach either end of the claim projectile. But the court of claims judge here relied on the word comprising in the preamble, correct? The court relied on the term including, which is a second open transition term. Liberty relies on the term comprising. I think the arguments are identical whether you're looking at including or comprising. Okay, so give me the article. We have to give some meaning to either of those terms, comprising or including. Where did the district court go wrong? It correctly identified those as open transition terms. But what it did wrong is in understanding that those terms could allow additional elements, they essentially allowed the comprising or including language to essentially abrogate a specific claim limitation. The claim specifies that the interface has to be disposed to intermediate opposite ends. The court said because it's open transitional language, you can add elements, i.e. additional length to the interface so that it can stretch. So there's no dispute on how one would construe the claim in and of itself, the claim language in and of itself? That would be my understanding. My reading of the trial courts, both its claim construction ruling and its trial decision, it seems to say, yeah, intermediate opposite ends means middle or in between. However, because it's an open transition term, you can extend it all the way and enclose either end of the projectile. So wouldn't that include the whole full metal jacket prior art? Correct. That is correct. It would include any interface that somehow covered the middle. That's the only limitation as the trial court sees it. So therefore, we think it was improper for him to find that you could do that because you're left with the result we had in this case where both accused A1 projectiles that enclosed the entire rear of the bullet and then extend forward roughly two-thirds of the length of the bullet somehow infringe, even though they're not intermediate in any way. And that's really our point here is he's abrogated the word intermediate. It's rendered meaningless in the claim because there's nothing intermediate either about the prior art MA55's jacket or the accused A1 projectile's jacket. On the second term that's in dispute, reduced area of contact, you make a kind of indefiniteness suggestion here, but you never raised indefiniteness as a defense, right? So validity contention because I'm struggling with this. I mean, if we agree with you that his construction is indefinite, I'm not sure that your alternative construction, one, is right or two, would not also be indefinite. Well, I think you are correct, Your Honor. We did not argue that that claim term was hopelessly indefinite at the time. Well, you don't want to use those words. That sounds like insolubly ambiguous. We've rejected that. Well, certainly, Your Honor, what we've argued is the trial court's construction was definitely indefinite, and we've argued against that construction. So tell me why you think you can justify your construction. Well, the specification gives you one guidepost that's objective as to determining the reduced area of contact. It just so happens that it's in the same caliber as the chief accused product and that it's also the predecessor to the accused product, the chief accused product, the MA55A1. So based on that, we would argue that it's pretty clear to someone skilled in the art trying to make a 5.56-millimeter bullet, it would be pretty clear as to where the bounds were. You would know if you had more contact area or less contact area than the one single bullet provided in the specification. Where I'm struggling is where you need to have some sort of comparison for a different caliber bullet. Right. Then what do you do? Well, that gets you into the second accused product, the M80A1. The M855, as it points out in the specification, what do we know about it? It's the NATO and Army standard bullet. Now we're in the 7.62 caliber with M80A1, so we have to make some determination of what's appropriate for that caliber. I think one of the skilled in the art would presume that if M855 is the 5.56 standard, that in the 7.62 caliber, the long-term NATO and Army standard bullet is the M80. So if you believe that M855 is the standard for M855A1, the logical conclusion would be that M80 is the standard for M80A1. And those are the only two accused products. Now if we moved into other calibers, we'd have to make another determination of what a traditional jacketed bullet would be. But in terms of the accused products, we think it's a pretty clear path to pick those particular bullets. The problem with the quartz construction is it pretty much left it wide open to one of the skilled in the art to pick a jacketed lead bullet in either caliber. And so we were left with 26 candidates for 5.56, and I believe 15 for 7.62. And that really is the epitome of indefiniteness. I mean, at some point when you have 26 standards, it's standard less. And I think that's the point we're making. So our view is given that the chief accused product is M855A1, you have to say to one of the skilled in the art looking at that, say the guide post is M855. And if that's correct, then it's clear to us that we don't infringe. We deliberately increase the contact area of both accused bullets. The M855A1 has 12% more contact area than the M855. The M80A1 has two variants of the M80, but we have 24% more contact area than one variant, and I believe 10% more than the other. So literal infringement is clear. Just before your time runs out, because I know you want to reserve your rebuttal, talk about a little, if you would, the running loyalty question, which is an interesting question. It is an interesting question, Your Honor, and perhaps it's interesting because this court has never addressed it before. And that's really the basis of our argument. This is an issue of first impression. I'm familiar with the de Graffenfeld case. It's a 1981 case from the Court of Claims. Vaguely, Your Honor. In that case, it specifically says that the plaintiff, we can only render money judgments for money presently due and owing from the United States. The plaintiff argues that it would be a waste effort to require it to bring suit for future infringements. Nevertheless, relief for future infringements is beyond the power of the court by declaratory judgment or otherwise. Well, I think that aligns to a large extent. I think that what we're really arguing here is that if, let's say that we do have an infringing product and we know, we anticipate it will be made in the future, we are asking that 1498 be construed in a way that would require them to file additional suits. That's really the practical effect. That may lead you to the question, why would that matter or why should we do that? I think that if we proceed under the trial court's theory that we just have to pay royalties, if we were to change our accused products in some substantive way that was not infringing, we would have to come back to the trial court and possibly a contempt proceeding and proceed in that manner. In this manner, if a complaint is filed and we change nothing, we would have to basically admit infringement and all of that. However, if we had defenses, we could bring them in the subsequent suits. So there is a very big practical difference in how things would happen in the future. And really the basis for our position is that 1498 covers items that were used or manufactured in the past tense. And to the extent there is any ambiguity in that, legal principles should apply to say that salver immunity should be strictly construed in favor of the government. So that's the, did I answer your question? Unless you have anything else besides that case to rely on, I mean you do have other things, but I think the main thing to rely on This court hasn't addressed it, but the predecessor court has. It has, Your Honor, and I think that's good to point out. In the Pitt-Kern and in the Irving-Earshoot cases, which are many decades ago, both of them, the court essentially said that in terms of a statute of limitations, each procurement or each production of a continuously produced item would be a separate taking. So therefore, a plaintiff is not barred simply because the initial production started before the critical day. So to be consistent with those cases, it does favor our position that future royalties are not permitted under the statute. You're into your rebuttal, so why don't we hear from the others. Mr. Jadlow. Thank you, Your Honor. Stephen Jadlow speaking on behalf of Liberty. There was a serious problem confronting the U.S. Army, the military, just to set the background for this, where in 1993, President Clinton had an executive order that mandated that at least 50% of the lead, which is part of the previous bullet, be removed. And that was part of a longer and continuing saga of taking lead out of virtually everything because it became something identified as a known carcinogenic. And the Army became concerned because they were under a lot of pressure by state environmental agencies to close or at least clean up all the firing ranges in the United States because of the accumulation of lead. And it got into ground waters, and in some places like Massachusetts, it actually got put into effect, and there were several of these that were cleaned. The second problem that confronted the old bullet was the idea of through-and-throughs, that because of the change in stature of some of the enemy combatants, and in fact even preceding that, through-and-throughs means a bullet hitting a target called a soft target, but what it really means is an enemy combatant. If it goes clean through, enters, and leaves the body, that isn't really – it's not good in any event. But the problem with it is that if it leaves, it hasn't expended all its energy inculpating tissue and perhaps organs in the body. And in the late part of the 1990s and early part of the first decade in 2000, this became a cause célèbre because when we talk about this, Colonel Glenn Dean, who was in charge of the Army's research into debriefing the warfighters, finding out what they – Mr. Judlow, can I interrupt you? I was wondering, now, if we were to agree with the government on two or more of its claim construction arguments, do you agree that that would resolve the infringement issues? I don't believe it would. First of all, there's a question of whether the complaint construction is proper. Now, I believe it to be settled law that if you have an open-ended connector, such as comprising, such as including, that that defines a limitation, and that limitation must be met applying to an accused product where there's no infringement. When something says you need something between A and B, and the construction for the jacket, the interface in the first place means you need to hold the aligned penetrator and slug behind it to rotate together and stay together in flight once the projectile leaves the firing weapon. That means it needs to be over the joint and hold it together, and that's what the judge found. Now, I believe counsel – So you think that the term could be – ought to be construed as covering every bullet, including those that have a full metal jacket? I believe as far as that part of the claim, the answer is yes. But how isn't that problematic? Because that reads out the limitation in its entirety. It reads out – the language is irrelevant if a full metal jacket is covered. Well, I don't – I would suggest that that isn't so. And in fact, the judge got it, I believe, exactly right when he says it must be present between the ends of the core of the penetrator and the slug. Except – but then his construction actually allowed for much more than that. No, that's – that is correct. And in fact, full metal jacket, the way he described it, but full metal jacket is included in that. What it means is that it may but doesn't have to extend to either end of the jackets. Now – Your point is that the interface portion could be anything so long as it's not just on the ends. Well, it has to be around the middle because it's got to hold the two things together for rotation and in flight or you don't have a weapon and you don't have a bullet. However, full metal jacket represents the very old prior art. It started with the Geneva Convention where full metal jacket became a safe harbor because one of the points of the Geneva Convention is metal shouldn't be flying all around a helter-skelter in a combat area. Full metal jacket will prevent the – the full metal jacket of the prior art prevents the essence or one of the essence of this invention which is that the bullet and the interface breaks up when it strikes the target. And full metal jacket does that for the most part. Certainly the prior art does and that was one of the problems with the M855 because it didn't break up when you had an aligned hit so it went with most of the energy and velocity aligned with the travel path of the bullet. You got it through and through. Can I just move you forward just because Thomas of the Essence and I know you want to get to your cross appeal. So let me just ask you about the running royalty question. The running royalty question. Yes, yes. And you heard Judge Stoll identify a case by our predecessor court that seems to be on point. Do you have any – what's your best legal argument as to why that was? The best legal argument is that the statute that weighs sovereign immunity here has in it a mandate that the complete and entire recovery is to be had for the infringer. Now I've forgotten whether it was the court or Mr. Brown that raised it but this notion of monetary damages which is what the Essence was in those cases that you can't assign an amount of damage expecting the future to continue as if you could measure how many rounds would be spent. The reality is this judgment only says that you have infringed and if you make more of these bullets therefore the validity presumably having been upheld and the infringement having been upheld. At that point we'll get from the army the number of units sold, we'll apply by the royalty rate that we have measured but not one penny beyond the end of this trial is part of any judgment. That will come only if the government continues selling infringing rounds and this is precisely what I believe a lot of the results of patent cases are coming to. Because since injunctions are no longer, I won't say automatic, but when I remember clients asking the question of will there be an injunction the answer was yes and the only exception I could find in the law was a 30 day permission to continue with a human waste treating plant in Michigan. As matters stand now unless, there are parts of those cases that kind of point a finger at the notion of well if there is no treatment of the continuing sale of the identical infringing products that means I suppose you have to file new complaints. Hourly? Monthly? Daily? The de Graffin case dealt with this very situation. There the patent was seeking a reasonable royalty for all future use of the invention and the court said yes there could be some wasted effort. The plaintiff argues it would be a waste of effort to require it to bring suit for future infringements but the court held nevertheless that's what had to be done given the court's jurisdiction. And it seems to me, it seems to us that the way this damage is structured the Congress and the President passed a statute and they passed a statute on a waiver of sovereign immunity for patent infringement. That statute required compensation of complete and entire relief. The notion of having to do this piecemeal is left to the courts as is everything else. When Congress wanted something not to happen, for example no injunctions as a relief for an infringement, there was no problem in getting it into a statute. They knew what they wanted and they had an impression. And there are lots of things that have happened with patent infringement relief here that are not explicitly in the statute but came from this court and from the claims court and the court of federal claims more recently. That provide relief such as convoyed sales, such as lost profits, such as a lot of things. But this is a case, this Grafenfeld case is dealing with the same statute we've got here which is section 1498 and is saying specifically that there won't be future running royalties based on the statute itself. So how do you respond to that? Well, we've cited in our brief a trademark case. I think it's from this court in which some of the infringing trademark elements were disposed of, sold before or during trial. But not all of them. And then there was a question of what happens with the rest of them? Can I dispose of them? And the answer for that was at a price, yes. Do you want to talk about the counterclaim on the NDA? I certainly do. Before that, if I can work in the notion of the reduction of damages. We've counterclaimed really for two issues that are not necessarily the same. One was a reduction. There needed to be a damage number that came from the court about how much having found infringement, having found validity, having quoted the defendant's own expert witness as admitting infringements, having told the court that they were only raising these two issues, what intermediate the ends for purposes of claim 32 and its dependent claims and the intermediate ends for claim 32 and the reduced area of contact for the claim once. If I might urge you, given the length of time, that I think like Judge Stowe, I'm much more interested in the counterclaim dealing with the implied authority on whether or not Lieutenant Kringle Dean had authority on that piece of it. So I want to make sure you reach that. Okay. Let's talk about that right now then. The counterclaim on the NDAs begins with the notion that what happened at the trial court level is he applied what amounts to the FAR rule, the Federal Acquisition Regulations rule. A, that there are people called with authority of contracting agents while acknowledging that you can also have authority implied because of your position in the job that you do. But there was no application – well, the emphasis of his argument was there are no contracting agents in the form of Dean or Campion or the other people who signed the contract. Well, let me ask you, what do you think – as I understand, as I recall, the standard applied by the court of claims is that the NDA, the person who signs, his signing NDAs has to be an integral part of his or her job. Yes. Do you agree with that standard and just think it was misapplied, and if so, why? Or do you think it was an improper standard? No, I think it was a proper standard, but it was misapplied. Colonel Dean was at Fort Benning in Georgia. He ran the directorate, which was going to support the troops and the products they had and the ammunition that they had. And his job was to debrief the soldiers, the war fighters, and find out whether they had any gripes that seemed legitimate, meaning better equipment, better ammunition, or better anything. And then when he found something that seemed to be worthy of it, then he should do something about it. Now, to do something about it by his own testimony meant that he dealt with the industry representatives looking for things that needed to be done, and it was nothing more important than getting rid of this bullet, which the government people had been unable to do for 13 years at that point. And that's a lot of American casualties using a bullet that people don't have confidence in, and maybe a lot of people staying a little bit longer behind the protection because they didn't trust the ammunition they were firing. So he met with these people, and his job was to find out not only what can I buy from the shelf and what can I buy now, but he was asking these companies for what's on the planning boards. What do you have coming along here that maybe we should expedite or we can use to solve our problems? That was his job, to find out what was coming as well as what was, and that's uncontradicted testimony in here. This Tucker Campion was doing the same job for SOCOM, Special Operations. He was asked again and again was his testimony by potential vendors of things that he might be interested in, the government might be interested. And he said that happened in almost every meeting, and I signed any time I was asked. I mean, basically, if there was a contract agent, which was a standard that the judge applied, he couldn't sign an NDA because the A in the FAR is for acquisition contracts. It requires a payment of money, it requires a purchase or sale of a service or equipment, none of which applied. Would you agree that he testified that he had signed NDAs fewer than five times during his time that he had this position? That's what Dean testified to. Fewer than five. I'm not sure what that means. And he signed this one, and he signed this one because there was an important hole in what he was supposed to find, which was this replacement ammunition. Okay. Well, we're way beyond time. We'll restore a minute for rebuttal, and let's hear from the other side. Thank you. Your Honor, let me address the non-disclosure agreement since we did not discuss that earlier. First of all, the Campion NDA was mentioned. I think it's important to know what has actually been appealed here. Two NDAs were not appealed, the Campion and the Marsh. The only NDA on appeal that's subject to the cross appeal is the one signed by Lieutenant Colonel Dean. They're also not challenging the authority of the contractor who also signed it. They're also not challenging the fact that Lieutenant Colonel Dean had no express authority. They're simply challenging whether Lieutenant Colonel Dean had— So who had the authority in your view? If a manufacturer wants to come in and demonstrate his wares, and he obviously for practical reasons needs an NDA, who has the authority? Well, I think that's one of the flawed assumptions of their arguments in their brief is that they assume that someone within the small arms branch has to have the authority. I think what the court essentially found, at least with regard to Colonel Dean, is that he didn't need authority to interact with industry. He didn't need the authority to sign NDAs to do that. And there's no evidence that anybody else— Well, that sounds a little weird to me. I mean, I think you're right. But the court of claims says that his job required him to write requirements and to facilitate discussions with the industry. Well, how are you supposed to have discussions about stuff that industry has come up with that may or may not be good for the government without sort of getting an NDA? I think what Lieutenant Colonel Dean testified to is people would come in and tell them that this was proprietary, and he would say, I understand. And they would show the stuff or the materials or whatever to him anyway under the goodwill that that was how they would do it. I think that there was never a time other than— And what would happen—has it ever happened that he said—they said, we need you to sign an NDA, and he says, I'm not going to do it. And then what happens? They could either— Does he send them to somebody else? Well, they can decide, you know what, I really want to sell to the Army. I'm going to go ahead and give you a presentation of what I can share with you. It may be that they have to go back to the Army and say, we want to have somebody who has authority to sign an NDA before we can share with you something. Let's say there's— So it's odd. It's odd because as Judge Still mentioned, the record before us looks like he signed fewer than five. Correct. Now, you can look at that as a very small number, or you can look at it as a quite robust number because five times he at least thought he had the authority. Nobody's suggesting that he was trying to pull something over on the people. So he thought he had the authority to sign NDAs. Right. Well, I think I would say this. I think it's a relative small number when you consider that he said he spent a large portion of his time meeting weekly with industry over two years. Well, did he say—and did he identify instances, a large number of instances, where people requested that he sign an NDA and he refused and declined? I don't know if that question was ever asked, which raises the point that this was Liberty's burden of proof. And it's also, to go further, when Mr. Marks came to visit Lieutenant Colonel Dean, the law is well settled that it's your duty to ascertain that you're dealing with somebody who has authority. Obviously, that is the well-stated law. Otherwise, you could have people binding the government who have zero authority to do so. Well, we operate in all of our cases, and we have a lot of government cases, and we operate under the assumption that unless proven otherwise, the government is assumed and presumed to operate in good faith. Doesn't that good faith extend to—this was not just some—nothing wrong with being a GS3, but this was not a GS3 sitting behind a reception desk. This was a person of some weight who was doing—clearly the government had given him the job to evaluate this stuff. So it doesn't seem kind of outrageous, out of line, to accept that he thinks he has the authority, and he does, and to take that at face value when he's willing to sign it, right? Well, I think that, again, just because some individual, no matter what their rank, thinks they have the authority, that's really not the determination. It has to be an objective view of what's integral to their duties, and that is a very big fact question that was ruled on by the lower court. So you have to say, was it clearly erroneous to think that Lieutenant Colonel Dean didn't have authority? I sense that what bothers Your Honor is like, well, if he can't sign it, who can? How can you navigate through the government if nobody has authority? I don't know if that question has really been presented here in the sense that I'm sure it's possible in other parts of the Department of Defense or in other situations with research and development agreements that someone does have express authority to enter into these type of arrangements. No, but really I appreciate your trying to get to what's bothering me. But what's really bothering me is I think it's perfectly – if it's a perfectly reasonable assumption from the outsider to assume that this person who he's supposed to go see about telling him what his wares are is willing to sign the agreement, I don't think – I mean, I know there's no detrimental reliance suggested here as far as I know. But it seems to me that if one actually relied on that and lost something, that's pretty problematic. I don't know that it's – you can say that it's unreasonable for a person to assume that if this fairly high-level person who's got the responsibilities to look at this stuff on behalf of the government is willing to sign an NDA, I can rely on that. Well, as harsh as it may seem in certain instances, the rule is that you have to ascertain that you're dealing with somebody with the proper authority. That is the law on that point. I would also add that, again, it's not so much whether you relied on your detriment or from the perspective of Mr. Marks what he has lost. Legally, it's a question of – with regard to this specific individual, regardless of his title, there is no apparent authority. Apparent authority is not permitted. When you look at his duties, was it integral to his duties? That is the legal standard. I think you properly stated that to Mr. Judlow. So then the question becomes a factual determination. Did Liberty meet its burden to prove that this was integral to Lieutenant Colonel Dean's duties? You have a very thin record. I think most of the testimony was elicited by us. And I would submit that it's their burden to prove it was integral, and they didn't do so. Anything else? Unless you have further questions, Your Honor. No, thank you. Thank you. All right. We're way beyond on time, so I'm going to try to hold you to that extra minute that I gave you, if that's necessary. Well, the sequence of events which led to this NDA signed by Colonel Dean was he contacted Dean in November of 2004 and said, the government put out a, does anybody have a bullet? We need one badly. And he, Marx, on his own undertook a design for it, was successful, contacted Dean and said, I think you'll be interested in this. Send me your form of NDA. Dean said, we don't have one. Why don't you send me your form, which happened the very next day. And then between November 5th and the meeting itself, which I think was February 17th, Dean had the NDA. And I think that under the circumstances of his title and his surroundings, the meeting was held at Ford Bank. And in fact, the result that happened here, the government could not make this bullet themselves. An outsider could and did present it to the government. The government made the bullet. They were very proud of themselves. They filed a patent application, never mind that they derived it from Marx. And at the beginning of the meeting, the first thing that happened was the NDA was signed because Marx wouldn't talk to him unless it was signed. And he had every right, as far as we're saying here, to believe that everything happened as it should have happened from the standpoint of logic. And any laymen under these circumstances would be taken to have. To say that nobody in the government has authority to execute an NDA and nobody can receive a pitch or an explanation of something that was of great value would be very distressing. And in fact, this one worked. This one solved a problem that had been vexing the government for 17 years. And from the standpoint of Marx, it happened the way it should. There's also the Siver arrangement where the proposal from Marx was read by the people who were running this effort to come up with a design. And in fact, where they couldn't do it for 17 years before, they managed to do it in two months adopting the design. There is an uncontested finding in this case that they copied the Marx design, which has consequences as far as any validity issue is apparent. Anybody who approaches obviousness by saying I'm going to take every element of the claims, I'm going to find that element somewhere, and then I'm going to say it's obvious to combine these 10 references that they used, it's wrong by an uncontested line of cases that go back probably forever is a long word, but for a century at least. Well, I'm going to bring this to a close here. We'll be on time. Do you have one final thought that you think is imperative? Just one final thought if I may. And that has to do with the reduction of the royalty rate. The judge's opinion wanted this over. And so he came up with the parties were at 20 cents a round and 1 cent a round. He said under all the circumstances, a baseline rate is 5%. And then he cited something from Learned Hand. No, that's not Learned Hand. He cited something that said that because all this work has to get done. And this was against a hypothetical negotiation date, which is mandatory to be at the beginning of infringement, which is when this patent issued at June 6th. This design was finished. It had been given to war fighters in the preceding months. It had been the subject of awards because the government was very proud of themselves. It had been the subject of their patenting. It had been subject to the PR that said that this is the best rifle rain round ever made. And against all of that to say that it required much more refinement, and therefore I'm going to reduce it under that section in Chisholm, relying on factor 8 of the Georgia-Pacific case was just plain wrong. He got the date wrong. And I think that's important. Nobody contests the date, the hypothetical negotiation date. Nobody contests the fact that zero had to be done at that date. Nobody contests the date that the government was very proud of it. Quote, end quote, quote. And therefore we think the 5% should be resurrected because the judge made a clear error.  Thank you.